UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kelly Harper,

    Petitioner,

v.

Warden of FCI Waseca,

    Respondent.

Case No. 23-cv-2502 (JRT/TNL)

REPORT AND RECOMMENDATION

Kelly Harper, FCI Waseca, P.O. Box 1731, Waseca, MN 56093, *pro se*.

Ana H. Voss and Kristen Elise Rau, U.S. Attorney's Office, 300 S. 4th St., Ste. 600, Minneapolis, MN 55415, for Respondent Warden of FCI Waseca.

    This matter is before the Court on Petitioner Kelly Harper's (1) "Motion Petition for Writ of Habeas Corpus Pursuant to 28 USC 2241 & Motion to Expedite 28 USC 2241" [ECF No. 1 ("Petition")]; (2) "Motion to [Expedite] Ruling [and Immediately] Release Kelly Harper from BOP Custody to Grant USC 2241" [ECF No. 14 ("Motion to Expedite")]; (3) "Motion to [Expedite] and Motion to Grant 18 USC 2241" [ECF No. 16 ("Second Motion to Expedite")]; and (4) motion received by the Court on March 15, 2024 [ECF No. 20 ("Discovery Motion")]. For the following reasons, the Court recommends dismissing portions of the Petition for lack of jurisdiction (as discussed below), denying the Petition's remainder, and denying the Motion to Expedite, Second Motion to Expedite, and Discovery Motion as moot.

## I.  BACKGROUND

### A.  Criminal Proceedings

In February 2021, a grand jury in the U.S. District Court for the Western District of Wisconsin ("USDC-WDWI") indicted Harper on one count of knowingly using a facility of interstate commerce (the Internet) to try to commit murder for hire, in violation of 18 U.S.C. § 1958(a). *See* Indictment 1, *United States v. Harper*, No. 21-CR-0018 (WMC) (W.D. Wis. Feb. 10, 2021).[1] In June 2021, Harper agreed to plead guilty. *See* Ltr. 1–3, *United States v. Harper*, No. 21-CR-0018 (WMC) (W.D. Wis. June 10, 2021) (containing plea agreement). U.S. District Judge William M. Conley later sentenced Harper to (as relevant here) 72 months imprisonment. *See* J. in a Criminal Case 2, *United States v. Harper*, No. 21-CR-0018 (WMC) (W.D. Wis. Oct. 1, 2021) ("Sentencing Judgment"). Harper is presently incarcerated at the Federal Correctional Institution in Waseca, Minnesota ("FCI-Waseca"). *See* Docket.

### B.  Petition

The Petition raises several sorts of issues.

- First, Harper claims that authorities with the Federal Bureau of Prisons ("BOP") are not giving her the right amount of earned-time credits ("ETCs") under the First Step Act of 2018. *See, e.g.*, Pet. 1; *cf.* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (codified as amended in scattered sections of 18, 21, and 34 U.S.C.) (containing underlying statutes).[2]

- Second, Harper suggests that BOP authorities impermissibly denied her access to the courts by failing to send certain materials to the USDC-WDWI during the briefing of Harper's motion seeking compassionate release under 18 U.S.C. § 3582(c)(1). *See* Pet. 1. She also

---

[1] Citations to filed materials use CM/ECF pagination.
[2] The Court will consider Harper's specific arguments on this issue in the "Analysis" section below.

2

  raises various other conditions-of-confinement claims about her time at FCI-Waseca—including allegations of various forms of abuse (including sexual abuse) and that prison authorities are failing to properly treat her cancer diagnosis. *See id.* at 4, 6.

- Third, Harper makes various claims aimed at undercutting her conviction—for instance, she claims that certain preconviction statements she made to authorities were obtained unconstitutionally. *See id.* at 2–3.

This action's docket presently has three pending motions. The Motion to Expedite and Second Motion to Expedite both reiterate Harper's request that the Petition be granted. *See* Mot. to Expedite 1; Second Mot. to Expedite 1. The Discovery Motion asks the Court to consider new exhibits submitted by Harper and again asks for the Court to expedite its ruling. *See* Discovery Mot. 1.

## II. ANALYSIS

### A. Challenges to Harper's Conviction

As a preliminary matter, the Court will first strip out two sorts of claims raised in the Petition that the Court cannot address in a habeas petition brought under 28 U.S.C. § 2241. The first are Harper's various suggestions that various constitutional problems undercut her conviction. Presenting these claims to this Court is a nonstarter: "[i]t is well settled [that] a collateral challenge to a federal conviction or sentence must generally be raised in a motion to vacate filed in the sentencing court under [28 U.S.C.] § 2255 . . . and not in a habeas petition filed in the court of incarceration . . . under § 2241." *Hill v. Morrison*, 349 F.3d 1089, 1091 (8th Cir. 2003) (citing *DeSimone v. Lacy*, 805 F.2d 321, 323 (8th Cir. 1986)); *see also, e.g.*, *Taylor v. Fikes*, No. 20-CV-1364 (PJS/ECW), 2022 WL 18584395, at *16 (D. Minn. Dec. 2, 2022) (making same points (citing cases)), *report and*

3

*recommendation adopted*, 2023 WL 1477839 (D. Minn. Feb. 2, 2023). The Court therefore has no jurisdiction over these challenges, so recommends denying the Petition to the extent it raises them.[3]

### B. Conditions-of-Confinement Claims

Harper's claims that she has experienced inappropriate or illegal conditions while at FCI-Waseca also fall outside of a habeas action's proper scope. The Eighth Circuit has made plain that courts cannot adjudicate conditions-of-confinement challenges in habeas actions. *See, e.g.*, *Spencer v. Haynes*, 774 F.3d 467, 470 (8th Cir. 2014) (quoting *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam)); *Kostelecky v. Rardin*, No. 23-CV-778 (KMM/DJF), 2023 WL 4409859, at *5 (D. Minn. June 5, 2023) (citing cases), *report and recommendation adopted*, 2023 WL 4407514 (D. Minn. July 7, 2023). The Court therefore recommends denying the Petition to the extent it challenges the conditions of Harper's confinement.

### C. Exhaustion

Before turning to the disputes over which the Court does have jurisdiction—i.e., Harper's actual habeas-type claims—the Court must address exhaustion. Harper brings this action under 28 U.S.C. § 2241. *See, e.g.*, Pet. 1. Petitions under § 2241 face an "exhaustion requirement": prisoners generally cannot secure relief through § 2241 if they have not exhausted their administrative remedies. *See, e.g.*, *Mathena v. United States*, 577 F.3d

---

[3] Under 28 U.S.C. § 2255(e)'s "savings clause," a federal court can have jurisdiction over a conviction-challenging § 2241 petition if the prisoner shows that the § 2255 remedy is "inadequate or ineffective to test the legality of [her] detention." *See, e.g.*, *Hill*, 349 F.3d at 1091 (discussing § 2255(e)). But it is a prisoner's burden to show that the savings clause applies. *See id.* (citing *DeSimone*, 805 F.2d at 323). Harper makes no showing that the § 2255 remedy is inadequate or ineffective here, so the savings clause does not give this Court jurisdiction over any challenges to her conviction.

4

943, 946 (8th Cir. 2009) (citing cases); *Purdy v. LeJeune*, No. 22-CV-2821 (JRT/ECW), 2023 WL 4561334, at *5 (D. Minn. July 17, 2023) (same), *report and recommendation adopted*, 2023 WL 5039748 (D. Minn. Aug. 8, 2023).

But exhaustion is a not a jurisdictional requirement for § 2241 petitions, so courts have the discretion to consider such petitions even where exhaustion has not occurred. *See, e.g.*, *Lueth v. Beach*, 498 F.3d 795, 797 n.3 (8th Cir. 2007) (citing cases); *Heil v. Eischen*, No. 23-CV-3845 (JMB/JFD), 2024 WL 406939, at *2 (D. Minn. Jan. 9, 2024) (same), *report and recommendation adopted*, 2024 WL 406603 (D. Minn. Feb. 2, 2024). When deciding whether to exercise this discretion, a court "balance[s] the interest of the individual in retaining prompt access to a federal forum against countervailing institutional interests favoring exhaustion." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992); *Heil*, 2024 WL 406939, at *2 (quoting *McCarthy*-reliant caselaw). Courts generally excuse exhaustion in § 2241 matters where there are "time constraints" or because "proceeding through administrative remedies would be futile." *Henderson v. Eischen*, No. 23-CV-1336 (NEB/ECW), 2023 WL 4422535, at *1 (D. Minn. June 7, 2023) (citing *Elwood v. Jeter*, 386 F.3d 842, 844 n.1 (8th Cir. 2004)), *report and recommendation adopted*, 2023 WL 4421372 (D. Minn. July 10, 2023); *see also, e.g.*, *Gant v. King*, No. 23-CV-1766 (NEB/ECW), 2023 WL 6930764, at *2 (D. Minn. July 7, 2023) (making same points (citing cases)), *report and recommendation adopted*, 2023 WL 6910771 (D. Minn. Oct. 19, 2023).

Here, Harper asserts that she has exhausted her administrative remedies. *See* Pet. 4. As best as the Court can tell, the Government's Response says nothing about exhaustion. *See generally* Resp. to Pet. for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 [ECF

5

No. 11 ("Response")]. Given this lack of a Government response, and because Harper claims that granting the Petition would lead to her immediate release, the Court finds that the balance of interests here favors addressing the Petition now without further considering exhaustion. *See, e.g.*, *Jones v. Fikes*, No. 20-CV-1341 (SRN/HB), 2020 WL 8513799, at *4 (D. Minn. Nov. 2, 2020) (citing cases for proposition that it "is Respondent's burden to establish lack of exhaustion," and recommending exhaustion-requirement waiver where "Respondent did not specifically address or rebut [the petitioner's] assertion or documentation"), *report and recommendation adopted*, 2021 WL 533700 (D. Minn. Feb. 12, 2021).

### D.     Early ETC Accumulation

With these issues put aside, the Court views the Petition as raising three habeas-cognizable issues. The first is the date when Harper could start earning ETCs. Judge Conley sentenced Harper on September 30, 2021. *See* Sentencing J. 1. Harper states—and the Government does not dispute—that after sentencing, "she was initially returned to Cimarron Federal Transfer and holding facility in Oklahoma, then sent to SFF Hazelton[4] on November 2021." Pet. 4 (errors in original). The Court construes the first part of this statement to mean that after sentencing, authorities took Harper to the Federal Transfer Center in Oklahoma City, Oklahoma. The Government's discussion states that Harper "arrived at her initial BOP designated facility" on November 17, 2021, so the Court assumes that this is when Harper arrived at SFF Hazelton. The dispute here is whether Harper could

---

[4] The Court understands "SFF Hazelton" to refer to a federal prison for women located near the Federal Correctional Institution–Hazelton in Preston County, West Virginia.

6

earn ETCs during some or all of this period from September 30, 2021, to November 17, 2021 (hereafter, the "Fall 2021 Period").

By way of preview, the Court notes that there seem to be two arguments in play here. The first concerns whether BOP regulations about when a sentence commences are an appropriate interpretation of the relevant statutes. The Court concludes that they are not. The second argument, however, considers whether BOP regulations providing ETC-relevant prisoner assessments only after prisoners reach an official longer-term facility reflect an appropriate statutory interpretation. Here the Court concludes that they do. Because of this second argument, the Court recommends rejecting Harper's arguments about her ability to earn ETCs in the Fall 2021 Period.

1. **Relationship Between 18 U.S.C. § 3632(d)(4)(B)(ii) and 28 C.F.R. § 523.42**

The Government first argues that Harper could not earn ETCs during the Fall 2021 Period because "eligible inmates begin earning [ETCs] on the date they arrive at their initial designated BOP facility where the sentence will be served." Resp. 14. Here the Government cites 28 C.F.R. § 523.42(a)–(b) and asserts this "properly interpret[s] 18 U.S.C. § 3632(d)(4)(B)(ii) in the context of 18 U.S.C. § 3585(a)." *Id*.

There is a plain tension here. Section 3632(d)(4)(B)(ii) states that "[a] prisoner may not earn [ETCs] for an evidence-based recidivism reduction program that the prisoner successfully completed . . . during official detention prior to the date that the prisoner's sentence commences under [18 U.S.C. § 3585(a)]." And under § 3585(a), "[a] sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting

7

transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served."

Before turning to the BOP regulations, consider how these statutes seem to apply to Harper's case. To be sure, Judge Conley sentenced Harper on September 30, 2021, and she apparently got to SFF Hazelton only on November 17, 2021. But it seems straightforward that during the Fall 2021 Period, Harper was indeed, in § 3585(a)'s terms, "in custody awaiting transportation to . . . the official detention facility at which the sentence is to be served."

The Government relies here on 28 C.F.R. § 523.42(a)–(b). Specifically, § 523.42(a) states that "[a]n eligible inmate begins earning [ETCs] after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served)." The parenthetical phrase here supposedly defines "commence." Under the § 523.42(a) definition of "commence," then, Harper's sentence only commenced when she "arrive[d] . . . at the designated Bureau facility where [her] sentence [would] be served"—that is, SFF Hazelton. The § 523.42(a) definition of "commence" thus differs from § 3585(a)'s.

This interaction of regulatory and statutory language raises a question of so-called *Chevron* deference. *See, e.g.*, *Rohr v. Reliance Bank*, 826 F.3d 1046, 1051 (8th Cir. 2016) ("*Chevron* deference applies when an agency interprets ambiguous language in its enabling statute." (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984))). The Eighth Circuit has recently described the doctrine as follows:

8

> In reviewing an agency's determination, we apply the "familiar two-step framework" from [*Chevron*]. Under this framework, we first consider whether "Congress has unambiguously spoken to the question at issue" by "us[ing] traditional tools of statutory construction." "If the statute is unambiguous, we simply apply the statute. If the statute is ambiguous, we proceed to the second step of *Chevron* and apply the agency's interpretation if it 'is based on a permissible construction of the statute.'"

*Voigt v. U.S. Env't Prot. Agency*, 46 F.4th 895, 900–01 (8th Cir. 2022) (citations omitted; second brackets in original); *see also, e.g.*, *Hernandez de Gutierrez v. Barr*, 489 F. Supp. 3d 899, 903 (D. Minn. 2020) (making same points).

The "*Chevron* step one" question for this Court, then, is whether Congress has unambiguously spoken on the question of what "commence" means for purposes of this case. The Court concludes that it has.[5] Section 3585(a) clearly indicates that a sentence commences when a defendant "is received in custody awaiting transportation to . . . [an] official detention facility." That answers the question of when Harper's sentence commenced: she was plainly "received in custody" on September 30, 2021. This means that the statute is unambiguous, and consideration of "*Chevron* step two" is unnecessary. *See, e.g.*, *BPP v. CaremarkPCS Health, L.L.C.*, 53 F.4th 1109, 1113 (8th Cir. 2022) ("Under *Chevron*, courts are required to defer to an agency's interpretation only if the statutory term at issue is ambiguous." (citing *Chevron*, 467 U.S. at 843)).[6] The Court therefore concludes that with respect to when Harper's sentence commenced, it commenced on September 30, 2021.

---

[5] Other courts have concluded the same. *See, e.g.*, *Jobin v. Warden, FCI-Mendota*, No. 23-CV-1700 (WBS/SKO), 2024 WL 1367902, at *3–4 (E.D. Cal. Apr. 1, 2024) (citing cases); *Patel v. Barron*, No. 23-CV-0937 (KKE), 2023 WL 6311281, at *5 (W.D. Wash. Sept. 28, 2023) (same); *Yufenyuy v. Warden, FCI Berlin*, 659 F. Supp. 3d 213, 218 (D.N.H. 2023).
[6] The Government suggests that when *Chevron* does not apply, courts nevertheless still apply so-called *Skidmore* deference. *See* Resp. 14 (referring to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). But as with *Chevron* deference,

## 2. Impact of § 523.42(b)(3)

Unfortunately for Harper, there is a second issue in play here distinct from when her sentence "commences" for ETC-earning purposes. As the Government notes, under the BOP regulations, "[a]n eligible inmate . . . may earn [ETCs] if he or she is successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment on or after January 15, 2020." 28 C.F.R. § 523.42(b)(3). The wording here implies that a prisoner can earn ETCs only after this "individualized risk and needs assessment"—only after that assessment can the BOP recommend "EBRR programs or PAs" whose successful completion triggers actual ETC-earning. If that assessment can only happen once a prisoner gets to his or her "official detention facility," then it follows that he or she cannot start earning ETCs until getting to that facility.

In the Court's view, this dispute comes down to a different deference question. Specifically, is the BOP's decision to have a prisoner's "individualized risk and needs assessment" occur only once she gets to her "official detention facility" a permissible interpretation of relevant statutes and regulations?

As a threshold point, it appears to the Court that the actual wording that makes the assessment occur after a prisoner gets to an official detention facility is not a federal statute or a BOP regulation (i.e., it is not in the U.S. Code or the Code of Federal Regulations). From the materials provided by the Government, it seems that this timing decision is

---

*Skidmore* deference only applies "when the statute is ambiguous." *Artola v. Garland*, 996 F.3d 840, 842 n.1 (8th Cir. 2021) (citing *Mansour v. Holder*, 739 F.3d 412, 415 (8th Cir. 2014)). As a result, because the Court concludes that § 3585(a) is unambiguous, *Skidmore* deference does not apply here.

instead instantiated in a BOP "Program Statement." *See* Fed. Bureau of Prisons, Program Statement 5410.01 § 5 (2022) (detailing "Risk and Need Assessment" procedures, and stating that "[a]fter the inmate's arrival to their designated facility for service of their sentence and during the initial admission and orientation phase, the PATTERN and SPARC-13 assessments will be completed"), *contained in* ECF No. 12-5.

So what sort of deference should a court give a BOP program statement? It is not *Chevron* deference: that concerns whether a given *regulation* appropriately interprets a statute, and a BOP program statement is not a full-blown regulation. In the Court's view, this issue is one of so-called *Auer* deference, the view that in certain situations "a court should defer to [an] agency's construction of its own regulation." *Kisor v. Wilkie*, 588 U.S. 558, 568 (2019).[7] The Eighth Circuit has indicated that *Auer* deference is appropriate where "'(1) the regulation [is] genuinely ambiguous; (2) the agency's interpretation of the regulation [is] reasonable; (3) the interpretation [is] the agency's authoritative or official position; (4) the interpretation . . . in some way implicate[s] the agency's substantive expertise; and (5) the interpretation . . . reflect[s] fair and considered judgment.'" *Voigt v. Coyote Creek Mining Co., LLC*, 999 F.3d 555, 561 (8th Cir. 2021) (quoting *Wells Fargo & Co. v. United States*, 957 F.3d 840, 855 (8th Cir. 2020) (Grasz, J., dissenting in part) (brackets and ellipses in *Voigt*)).

Considering these requirements, the Court concludes that it should defer to the BOP's decision to implement relevant the regulations by having a prisoner's initial risk

---

[7] The citation here is to a portion of *Kisor* (Section II-A) written by Justice Kagan that did not secure a majority vote. But other *Kisor* opinions show that this brief definition of *Auer* deference is uncontroversial. *See, e.g.*, *id*. at 591 (Roberts, C.J., concurring in part); *id*. at 592 (Gorsuch, J., concurring in the judgment).

assessment take place after arrival at an official detention facility. Section 523.42(b)(3) says nothing of when the initial assessment should occur, so it is ambiguous on the point. Nor is there anything obviously unreasonable about the BOP's interpretation here: the initial risk assessment must take place at some point, and it certainly seems reasonable to have it take place at the institution where a prisoner is presumably going to stay long-term. The BOP's program statement here is clearly the BOP's official position about how prisoners earn ETCs, and it is replete with discussions reflecting the BOP's substantive expertise in administering prison affairs. And finally, there is simply no reason on the present record to suggest that the BOP's decision here fails to reflect a fair and considered judgment.

The Court therefore concludes that the BOP's decision to have initial risk assessments occur when a prisoner arrives at an official detention facility acceptably implements relevant statutes and regulations.[8] For this reason, the Court concludes that even though Harper is correct about when her sentence "commenced," she still was not eligible to earn ETCs during the Fall 2021 Period.[9]

---

[8] A side point worth clarifying: Matters here might be different if relevant statutes clearly dictated that a prisoner must be able to start earning ETCs as soon as a sentence commences. Were this the case, any delay between a sentence's commencement and a prisoner's initial risk-and-needs assessment might conflict with statutory provisions. But on this Court's read, the relevant statutes do not require that a prisoner begin earning ETCs right away. Indeed, if anything, § 18 U.S.C. § 3632(d)(4)'s references to "successful completion" and "successful participation" in relevant programs and activities suggests that risk-assessment tools have to take place before a prisoner can earn ETCs. Furthermore, various provisions of 18 U.S.C. § 3632 contemplate the use of a "risk and needs assessment system" used to, among other things, "determine the type and amount of evidence-based recidivism reduction programming *that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs*." 18 U.S.C. § 3632(a)(3); *see also id.* § 3632(b) (stating that risk-assessment system "shall provide guidance on the type, amount, and intensity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner"). Given these statutory provisions, the Court has trouble finding unreasonable the BOP's decision to have an initial risk assessment occur once a prisoner reaches an official detention facility.

[9] For whatever reason, the decisions cited above in footnote 5 do not discuss this issue. But in this Court's view, the issue is fairly raised by the Government's briefing and in effect supersedes the commencement-of-sentence issue, so the Court cannot simply ignore it.

### E. Rate Argument

The Court next turns to the parties' dispute about the rate at which Harper has been accumulating ETCs. Harper contends that she should have been granted "15 days per month of FSA credits," and that she should have been accumulating ETCs at this rate for her entire sentence thus far. *See* Addendum 1.[10] On the rate question, the Government responds that from November 17, 2021, through June 13, 2022, Harper properly earned "10 days of ETCs for every 30 days of programming," and that she has earned "15 days of ETCs" since. *See* Resp. 10; *see also, e.g.*, *id.* at 17–23 (providing fuller argument on point).

This dispute's nub is thus when Harper should have started earning ETCs at the rate of 15 days of ETCs for every 30 days of programming. The key statutory language here reads as follows:

> **(4)** **Time credits.**--
>
> **(A)** **In general.**--A prisoner . . . who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits as follows:
>
> **(i)** A prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.
>
> **(ii)** A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of

---

[10] For purposes of clarity, the Court notes that in Harper's view, the BOP should have been applying this 15-days-per-month rate during the Fall 2021 Period as well as during the rest of her sentence. *See* Addendum 1. For the reasons discussed in Section II.D above, the Court concludes that Harper could not earn *any* credits during the Fall 2021 Period. This means that any dispute over Harper's rate of ETC accumulation during that period is irrelevant. In the discussion that follows, then, the dispute is simply about Harper's rate of ETC accumulation after the Fall 2021 Period.

> recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

18 U.S.C. § 3632(d)(4)(A); *see also, e.g., id.* § 3632(d)(5) ("A prisoner who successfully participates in evidence-based recidivism reduction programming or productive activities shall receive periodic risk reassessments not less often than annually . . . .").

The BOP implemented this statutory command with a regulation listed at 28 C.F.R. § 523.42(c)(2).

> (c)  Amount of FSA Time Credits that may be earned.
>
> (1)  For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn ten days of FSA Time Credits.
>
> (2)  For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn an additional five days of FSA Time Credits if the inmate:
>
> (i)  Is determined by the Bureau to be at a minimum or low risk for recidivating; and
>
> (ii)  Has maintained a consistent minimum or low risk of recidivism over the most recent two consecutive risk and needs assessments conducted by the Bureau.

As best as the Court can tell, there is no real dispute between the parties as to whether the BOP has followed § 523.42(c)(2) to determine when Harper started earning ETCs at the rate of 15 days per month of programming. Indeed, Harper's Reply contains

14

no argument addressing the Government's argument about when 15-days-per-month accumulation should have begun. *See generally* Reply. This arguably means that Harper has simply conceded the point here.

Even if she has not, the Court agrees with the Government here. The question boils down to whether § 523.42(c)(2) is a permissible interpretation of 18 U.S.C. § 3632(d)(4)(A). The Court sees no obvious reason why it is not. Harper's argument is apparently that the BOP is impermissibly interpreting § 3632(d)(4)(A) by not letting her earn credits at the 15-days-per-month rate immediately, and it is certainly true that § 523.42(c)(2) does not let a prisoner start earning ETCs at that rate immediately. But it is obvious from § 3632(d)(4)(A) that Congress did not contemplate prisoners getting ETCs at the increased rate immediately—that is simply the logical consequence of a prisoner getting the increased rate only after "2 consecutive assessments." Harper therefore has not demonstrated that § 523.42(c)(2) is an impermissible implementation of § 3632(d)(4)(A). The Court therefore rejects Harper's argument about her rate of ETC accumulation.

### F. Place of Confinement

The parties' third apparent area of dispute is about whether Harper should be serving some or all of her sentence at "home on in-home confinement" or in a "half way house." *See* Pet. 6. Harper's apparent view is that she is entitled to one of these outcomes for a year before the end of her sentence. *See id.* The Government contends that the Court lacks jurisdiction over BOP decisions concerning where federal prisoners serve their sentences. *See* Resp. 25–28. Here again, Harper says nothing in reply to the Government's

15

jurisdictional argument in the Response, so again, she has arguably conceded the point. *See generally* Reply (presenting no jurisdictional argument).

As before, though, even if Harper has not conceded the point, the Court agrees with the Government.  Under 18 U.S.C. § 3621(b), "[t]he [BOP] shall designate the place of [a] prisoner's imprisonment," and "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."  This straightforwardly strips this Court of jurisdiction to order the BOP to place Harper in in-home confinement or placement in a halfway house for any portion of her sentence.  *See, e.g.*, *Morrow v. Eischen*, No. 23-CV-2137 (JMB/DTS), 2024 WL 1939196, at *2 (D. Minn. Apr. 8, 2024) (citing § 3621(b)), *report and recommendation adopted*, 2024 WL 1932537 (D. Minn. May 1, 2024); *Kern v. Fikes*, No. 21-CV-2211 (WMW/LIB), 2022 WL 2959973, at *6 (D. Minn. June 16, 2022) (citing cases), *report and recommendation adopted*, 2022 WL 2953933 (D. Minn. July 26, 2022).  The Court therefore recommends denying the Petition to the extent that Harper seeks immediate placement in home confinement or in a halfway house.[11]

---

[11] To be sure, § 3624(c)(1) states that the BOP "shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community."  The "shall" language here imposes an obligation on the BOP.  *See, e.g.*, *Elwood*, 386 F.3d at 846.  But the language here does not require any particular placement decision, and so without more argument from Harper to the contrary, the Court cannot conclude that § 3624(c)(1) obligates the BOP to place Harper in in-home confinement or in a halfway house.

16

G.  **Pending Motions**

The Court recommends dismissing the Petition in its entirety. Given this recommendation, the Court further recommends denying the Motion to Expedite, the IFP Application, and the Discovery Motion as moot.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Petitioner Kelly Harper's "Motion Petition for Writ of Habeas Corpus Pursuant to 28 USC 2241 & Motion to Expedite 28 USC 2241" [ECF No. 1] be **DISMISSED WITHOUT PREJUDICE**, for lack of jurisdiction, to the extent it (1) challenges her conviction and/or conditions of confinement, and (2) seeks Harper's immediate placement in home confinement or in a halfway house.

2. The Petition otherwise be **DENIED**.

3. Harper's "Motion to [Expedite] Ruling [and Immediately] Release Kelly Harper from BOP Custody to Grant USC 2241" [ECF No. 14], "Motion to [Expedite] and Motion to Grant 18 USC 2241" [ECF No. 16], and motion received by the Court on March 15, 2024 [ECF No. 20] be **DENIED** as moot.

[Continued on next page.]

      4.      This action be **DISMISSED**.

Dated: May __28__, 2024            *s/ Tony N. Leung*
                                                                   Tony N. Leung
                                                                    United States Magistrate Judge
                                                                    District of Minnesota

                                                                    *Harper v. Warden of FCI Waseca*
                                                                    Case No. 23-cv-2502 (JRT/TNL)

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).